# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

MELVIN J. TAYLOR,

     Petitioner,

v.           CIVIL ACTION NO. 5:05-cv-00781

TODD R. CRAIG, Warden,

     Respondent.

### MEMORANDUM OPINION AND ORDER

Before the Court is Petitioner Melvin Taylor's Application Under 28 U.S.C. § 2241 for Writ of Habeas Corpus by a Person in Federal Custody [Docket 1].  By Standing Order entered July 21, 2004, and filed in this case on September 21, 2005, this action was referred to United States Magistrate Judge R. Clarke VanDervort for submission of proposed findings and recommendations (PF&R).  Magistrate Judge VanDervort filed entered a PF&R on February 5, 2009 [Docket 23].  In the PF&R, the magistrate judge recommended that the Court deny Petitioner's § 2241 petition and dismiss this civil action from the Court's docket.

The Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed.  *Thomas v. Arn*, 474 U.S. 140, 150 (1985).  In addition, failure to file timely objections constitutes a waiver of de novo review and Petitioner's right to appeal this Court's order.  *See Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Here, objections to Magistrate Judge VanDervort's

PF&R were due by February 23, 2009, pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Petitioner timely filed objections on February 19, 2009. This matter is fully briefed and ripe for the Court's consideration.

## I. BACKGROUND

On January 1, 1992, Petitioner was involved in an altercation in the District of Columbia that culminated in the fatal stabbing of a victim. He pled not guilty to charges arising from the incident and proceeded to trial. On January 21, 1993, Petitioner was convicted in the District of Columbia Superior Court of threatening to injure a person and manslaughter. The court imposed a maximum sentence of imprisonment of forty-five years. The sentence provided that Petitioner would be eligible for parole after serving one-third of the maximum sentence, or fifteen years, less any good-time credit earned.

The factual background of Petitioner's claims would be incomplete without noting significant changes to the parole determination process for D.C. Code offenders that occurred after Petitioner's sentencing but prior to his first parole suitability hearing. At the time of Petitioner's sentencing, the authority to make parole determinations for D.C. Code offenders was vested in the District of Columbia Parole Board (D.C. Board). The D.C. Board's decisions were guided by regulations adopted in 1985 and published in the District of Columbia Municipal Regulations in 1987 (1987 Regulations). *See* D.C. Mun. Regs. tit. 28, §§ 100 *et seq*. (1987) (repealed 2000).[1] The 1987 Regulations were further clarified by Policy Guidelines adopted by the D.C. Board on

---

[1] The Court expresses its gratitude to the librarians at the Fourth Circuit Satellite Library in Charleston and the District of Columbia Circuit Library for their assistance in locating copies of these regulations.

December 16, 1991 (1991 Guidelines).[2] *See Sellmon v. Reilly*, 551 F. Supp. 2d 66, 68, 85 (D.D.C. 2008). Underlying Petitioner's claims is the argument that the 1987 Regulations and 1991 Guidelines in place at the time of his sentencing are controlling for the purposes of determining whether he is suitable for parole.

In 1997, Congress overhauled the District of Columbia's government, including the parole system. *See* National Capital Revitalization and Self-Government Improvement Act, Pub. L. No. 105-33, § 11231, 111 Stat. 712, 745–46 (codified at D.C. Code § 24-131). Effective August 5, 1998, the D.C. Board was abolished and its jurisdiction over parole decisions for D.C. Code felons was transferred to the United States Parole Commission (USPC). Upon assuming the D.C. Board's jurisdiction, the USPC began a process of revising the regulations for determining D.C. Code offenders' suitability for parole. *See Sellmon*, 551 F. Supp. 2d at 72–73 (discussing revisions). The revisions were codified at 28 C.F.R. §§ 2.70–2.107 in 2000 (2000 Regulations). The 2000 Regulations specify that they are applicable to any D.C. Code offender, such as Petitioner, whose first parole hearing would occur after August 5, 1998. *See* 28 C.F.R. § 2.80(a)(5). The changes embodied in the 2000 Regulations are significant, and, according to Petitioner, they "create[] 'a

---

[2] The Board gave the following rationale for adopting the 1991 Guidelines:

> Many of the descriptive terms used in the Parole Guidelines criteria are judgmental and subjective. As such, they lend themselves to disparate interpretations and applications by Guideline users. To ensure equitable treatment of similarly-situated offenders, these terms require definitions that facilitate equitable application across affected cases, while preserving sufficient discretion to accommodate individual circumstances.

D.C. Board of Parole, Policy Guideline 1 (Dec. 16, 1991).

significant risk' of a 'longer period of incarceration than under the earlier [1987 Regulations].'" (Docket 25 at 4 (quoting *Garner v. Jones*, 529 U.S. 244, 255 (2000)).)

Factoring good-time credits, Petitioner became eligible for parole on May 25, 2002.  The USPC granted him an initial parole eligibility hearing in advance of that date, on December 20, 2001.  At that time, he had served 119 months in custody.  Applying the 2000 Regulations, the USPC determined that the Total Guideline Range for Petitioner to be suitable for parole was 165 to 185 months.  (Docket 12, Ex. 3.)  Accordingly, Petitioner was denied parole and a reconsideration hearing was scheduled for December 2004.

Petitioner came before the USPC in April 2005, after serving 152 months in custody, for his second parole suitability hearing.  Since his first hearing, he had been subject to two disciplinary actions.  His Total Guideline Range was increased by 0–2 months for these incidents.  Additionally, sixteen disciplinary actions occurring between 1994 and 2000, which had not been considered at his first parole hearing, were factored into the recalculation of his Total Guideline Range.  As a consequence, his Total Guideline Range was increased from 165–185 months to 241–303 months. (Docket 12, Ex. 5, 6.)  Petitioner's parole again was denied, and a rehearing was scheduled for February 2010.

Petitioner filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 on September 21, 2005, shortly following the denial of his second parole application.[3]  He alleges

---

[3]  Petitioner was incarcerated at the Federal Correctional Institution, Beckley, at the time this § 2241 petition was filed.  He has since been transferred to the United States Penitentiary, McCreary, in Pine Knot, Kentucky.  It is unclear whether this Court retains jurisdiction to grant Petitioner habeas relief in light of *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004).  *See Wilkes v. Anderson*, 5:04-CV-1304, 2007 U.S. Dist. LEXIS 11789, at *3 n.1 (S.D. W. Va. Feb. 20, 2007) (Johnston, J.).  However, this question need not be addressed as other forms of relief may be available to Petitioner.

four grounds for relief relating to the second parole hearing: (1) The hearing was procedurally unconstitutional because the USPC relied on incident reports from a contract prison; (2) The use of the 2000 Regulations for Petitioner's hearing, rather than the regulations in place at the time of Petitioner's original offense, was a violation of the Ex Post Facto Clause[4]; (3)  The USPC took Petitioner's "street time" and "good time" credit in violation of the Third and Thirteenth Amendments; (4) The USPC violated Petitioner's due process rights by failing to disclose adverse evidence against him and by denying him the representation of an attorney at the hearing.  (Docket 1 at 7.)

In a PF&R entered February 5, 2009, the magistrate judge rejected each of Petitioner's arguments.  Petitioner has asserted seven enumerated objections to the PF&R, and he is entitled to de novo review of each of the magistrate judge's findings to which an objection is properly directed. Several of the objections are related and will be considered collectively.  The objections fall into three categories: (1) objections to the use of the 2000 Regulations on ex post facto grounds; (2) objections to the magistrate judge's characterization of Petitioner's claims; and (3) an objection to the recommended disposition of the petition without an evidentiary hearing.

## II.  PETITIONER'S OBJECTIONS

### A.    Objections on Ex Post Facto Grounds

The common thread among each of Petitioner's claims is the contention that the USPC conducted Petitioner's parole hearing in an unconstitutional manner.  Because Petitioner's initial parole hearing occurred after 1998, the USPC proceeded under the policies and guidelines set forth in its 2000 Regulations.  It can be presumed that the challenged USPC actions were dictated by, and

---

[4]  "No Bill of Attainder or ex post facto Law shall be passed."  U.S. Const. Art. 1, § 9, cl. 3.

its decision informed by, these regulations.  *See Garner v. Jones*, 529 U.S. 244, 256 (2000).  The

manner in which Petitioner's parole hearings were conducted likely would be different, however,

if the USPC had applied the 1987 Regulations and 1991 Guidelines.  A finding that the incorrect

regulations were applied to Petitioner's parole hearings would moot claims attributable to USPC's

actions under the 2000 Regulations.[5]  Therefore, expediency dictates that the analysis of Petitioner's

claims begin with his argument that the Ex Post Facto Clause requires that his parole hearings be

conducted under the 1987 Regulations and 1991 Guidelines.

Contrary to the recommendation in the magistrate judge's PF&R, the Court does not find it

appropriate to dismiss Petitioner's ex post facto claims as being without merit.  Petitioner's ex post

facto argument presents a thorny question for which there is no clear consensus among the

authorities.[6]  Prior to the Supreme Court's decision in *Garner v. Jones*, 529 U.S. 244 (2000), there

was a greater degree of consistency among courts regarding ex post facto challenges to parole

decisions.  The most prevalent position was that parole rules, regulations, and guidelines, when

promulgated by non-legislative bodies such as state parole boards or the USPC, were not "laws"

subject to the Ex Post Facto Clause.  *See*, *e.g.*, *Di Napoli v. Ne. Reg'l Parole Comm'n*, 764 F.2d 143,

147 (2d Cir. 1985) ("[F]ederal parole guidelines as applied here are not 'laws' within the meaning

of the ex post facto clause . . . ."); *Inglese v. U.S. Parole Comm'n*, 768 F.2d 932, 935–36 (7th Cir.

1985) )("[P]arole guidelines are not 'laws,' and therefore can be applied ex post facto without

---

[5]  Petitioner's ex post facto objection is expressed in his third objection.  (Docket 25 at 3–10.)  His fourth, fifth, and sixth objections dispute specific actions taken by the USPC.  (*Id*. at 10–12.)

[6]  *See* James R. Dillon, *Doubting* Demaree*: The Application of Ex Post Facto Principles to the United States Sentencing Guidelines after* United States v. Booker, 110 W. Va. L. Rev. 1033, 1056-77 (2008) (providing a timely discussion of the history and present status of courts' application of ex post facto principles to federal parole guidelines).

violating petitioner's constitutional rights."). Since *Garner*, several courts, including this Court in one opinion,[7] have continued to adhere to the view that parole guidelines are categorically excluded from the proscription on ex post facto laws. *See, e.g.*, *Moore v. O'Brien*, 7:06-CV-515, 2007 U.S. Dist. LEXIS 34381, at *12–*13 (W.D. Va. May 10, 2007); *Skinner v. Hastings*, 7:05-CV-370-DCR, 2006 U.S. Dist. LEXIS 59739, at *12–*13 (E.D. Ky. Aug. 22, 2006). However, these opinions are at odds with the Supreme Court's holding in *Garner*.

In *Garner*, the Supreme Court was presented with an ex post facto challenge to an amended "rule" setting the frequency of parole reconsideration hearings for state prisoners in Georgia. 529 U.S. at 246–47. The prior version of the rule required that prisoners receive parole reconsideration hearings at least every three years. The new rule extended the period for reconsideration to at least every eight years, but the Georgia Board of Pardons and Paroles maintained discretion to hold hearings at more frequent intervals. The new rule was not prompted by any changes to the Georgia Code; it was amended by the Georgia Board of Pardons and Paroles on its own initiative.

*Garner* rejected the notion that ex post facto concerns are inapplicable to rules, regulations, and policies promulgated by parole boards to structure the exercise of their statutory discretion. *Id*. at 253; *see also Michael v. Ghee*, 498 F.3d 372, 282 (6th Cir. 2007) (noting *Garner* "made clear that guidelines that affect discretion, rather than  mandate outcomes, are nevertheless subject to ex post facto scrutiny"). Rather than focusing on the form by which a parole scheme is amended (i.e. by law or by regulatory action), *Garner* admonishes courts to examine the practical effect the change will have on the prisoner. *Garner*, 529 U.S. at 255. Under the effects-analysis approach, to succeed on an ex post facto challenge to a change in a parole scheme, a prisoner "must demonstrate, by evidence

---

[7]  *McKissick v. U.S. Parole Comm'n*, 295 F. Supp. 2d 643 (S.D. W. Va. 2003) (VanDervort, M.J.).

drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." *Id* (citing *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 506–07 n.3 (1995)).

A number of courts have had occasion to apply *Garner* to cases in which prisoners raise ex post facto challenges to changes in parole policies. The majority of these courts have utilized the effects-analysis approach to assess the merits of the prisoners' claims. *See, e.g.*, *Brown v. Williamson*, No. 06-3703, 2009 U.S. App. LEXIS 1807 (3d Cir. Jan. 29, 2009) (unpublished disposition); *Michael v. Ghee*, 498 F.3d 372 (6th Cir. 2007); *Fletcher v. Reilly* (*Fletcher III*), 433 F.3d 867 (D.C. Cir. 2006); *Glascoe v. Bezy*, 421 F.3d 543 (7th Cir. 2005); *Sellmon v. Reilly*, 551 F. Supp. 2d 66 (D.D.C. 2008). The Court finds the interpretation of *Garner* in these opinions to be persuasive. Accordingly, the Court would be remiss to deny Petitioner's ex post facto claim on its merits without undertaking a "searching comparison" of the 1987 Regulations and the 2000 Regulations to determine if the new regulations "create[] a significant risk that he will be subjected to a lengthier incarceration than he would if the [USPC] had adhered to the rules and practices of the D.C. Board."[8] *Fletcher III*, 433 F.3d at 879.

---

[8] This case is factually distinguishable from *Warren v. Baskerville*, 233 F.3d 205 (4th Cir. 2000), a case in the Fourth Circuit affirmed the dismissal of a prisoner's ex post facto challenge to a policy of the Virginia Parole Board. The challenged document in *Warren* was a "mere statement[] of enforcement policy" that did not "have the force and effect of law." *Id.* at 208 (citations omitted). By contrast, the regulations at issue in the present case are more akin to the "formal, published statement as to how the [parole-granting entity] intends to enforce its [rules]" subjected to ex post facto review in *Garner*. 529 U.S. at 257. *Cf. Trice v. Reilly*, 5:08-CV-31, 2009 U.S. Dist. LEXIS 16179, at *13 (N.D. W. Va. Mar. 2, 2009) (Stamp, J.) (noting that *Warren* "does not appear to have addressed the question of whether the [USPC's 2000 Regulations] constitute laws (or regulations) or administrative policies for ex post facto purposes").

*(1)    2000 Regulations*

The 2000 Regulations dictate the process the USPC follows to calculate the number of months a prisoner should serve in custody before he is suitable for parole.  The end result of the process is the Total Guideline Range, which is expressed as a range of months.  The USPC has discretion to depart from the guideline range when deciding whether to grant or deny parole, provided that it explains the rationale for its decision.  *See* 28 C.F.R. §§ 2.73(a), 2.80(n).

The USPC follows the process described below to calculate a prisoner's Total Guideline Range at his initial parole hearing.  For reconsideration hearings, the USPC starts with the Total Guideline range found at the previous hearing.  If any disciplinary infractions were committed in the time since the prior hearing, the guideline range is increased accordingly.  The adjustment for superior program achievement also is recalculated to account for the prisoner's achievements since the last hearing.  *Id*. § 2.80(m).

The first step to determining the Total Guideline Range is to ascertain the minimum number of months the prisoner must serve before he becomes eligible for parole.  For D.C. Code offenders, the minimum term to be eligible for parole generally is one-third of the maximum sentence imposed by the court less any good-time credits.  In Petitioner's case, he was eligible for parole after 119 months.

The second step in determining a prisoner's Total Guideline Range is to calculate a prisoner's Base Point Score.  A Base Point Score of 1 to 10 is determined by assessing three categories: Category I: Risk of Recidivism; Category II: Current or Prior Violence; and Category III: Death of Victim or High Level of Violence.  *Id*. § 2.8(f).  The possible Base Point Scores

correspond to a range of months that are added to the minimum number of months the prisoner must serve before he becomes eligible for parole.

For Category I, the USPC assigns the prisoner a Salient Factor Score (SFS). The SFS, which ranges from 1 to 10, "serves as an aid in determining the parole prognosis (potential risk of parole violation)." *Id*. § 2.20(e). The SFS accounts for six factors: (1) convictions prior to the conviction for which the prisoner is serving the current sentence; (2) prior terms of incarceration greater than thirty days; (3) the prisoner's age at the time the present offense was committed; (4) whether the prisoner had been incarcerated for a period of at least thirty days within three years of the present conviction; (5) whether the prisoner was under court-imposed supervision at the time of the present conviction; (6) and whether the prisoner is considered an "older offender." *Id*. § 2.20 Items A–F. Based on the SFS, a prisoner's risk of recidivism is considered to range from "Poor" (SFS of 3–0) to "Very Good" (SFS of 10–8). *Id*. § 2.80(f). A prisoner can receive up to 3 points towards his Base Point Score for showing a "Poor" risk of recidivism.

Petitioner received 1 point towards his Total Point Score as a result of Category I. Due to a prior offense and his age at the time his conviction, Petitioner was assigned an SFS of 6, which places him in the category as presenting a "Good" risk for recidivism.

For Category II, the USPC determines the type of risk a prisoner poses by accounting for incidences of violence and firearm possession. *Id*. A prisoner can receive up to 4 points towards his Base Point Score for demonstrating violence in the current offense of conviction and in at least one prior conviction. Because Petitioner had a history of violence for his current conviction and for one prior conviction, he was given 3 points under Category II.

-10-

Under Category III, 3 points are added to the Base Point Score if the current conviction involved the use of violence and resulted in the death of the victim.  Two points are added if the conviction involved attempted homicide or violence for which the victim's death was a probable result.  One point is added if the offense involved non-fatal violence.  Petitioner's current conviction, manslaughter, resulted in the death of a victim, so he received the maximum 3 points for Category III.

Adding the points from Categories I, II, and III produces a Base Point Score of 1 to 10.  Each number corresponds to a base guideline range.  The ranges vary from 0 months for a prisoner with 3 or fewer points to a range of 156–192 months for a prisoner who receives the maximum base point score of 10.  *Id*. § 2.80(h).  Petitioner's Base Point Score of 7 corresponded to a base guideline range of 54–72 months.  This range was added to Petitioner's 119-month minimum term to be eligible for parole to produce a guideline range of 173–191 months.

Once the base guideline range is added to the minimum number of months the prisoner must serve before becoming eligible for parole, it is adjusted based on the presence of specified aggravating or mitigating factors.  Disciplinary infractions incurred at any time during the prisoner's present term of incarceration are considered aggravating factors that can increase the Total Guideline Range.  A range of months corresponding to the gravity of the infraction is added to the guideline range for each incident.  *Id*. § 2.80(j); *see also id*. § 2.36.  Prisoners can decrease the guideline range by demonstrating "superior program achievement."  *Id*. § 2.80(k).  "Superior program achievement may be demonstrated in areas such as educational, vocational, industry, or counseling programs, and is to be considered in light of the specifics of each case."  *Id*. § 2.60(b).  The reduction for superior program achievement is equivalent to one-third of the number of months

during which achievement was demonstrated, *id*. § 2.80(k), but the maximum reduction is capped at certain levels based on the length of time a prisoner must serve before his presumptive parole date, *id*. § 2.60(e).

At Petitioner's April 2005 reconsideration hearing, the USPC noted numerous disciplinary infractions on Petitioner's record. The majority of the infractions had occurred prior to his initial parole hearing in May of 2002, but had not been included in his Total Guideline Range at that time. In total, the disciplinary infractions occurring prior to May 2002 were cited to add 76–118 months to Petitioner's guideline range. The USPC also added 0–2 months for a fight Petitioner was involved in since his initial hearing. Four additional infractions are noted on Petitioner's record that the USPC considered, but did not contribute to any increases in the guideline range; two of the infractions—"failure to follow work rules" and "conduct which disrupts others"—took place during the time between the two parole hearings. (Docket 12, Ex. 4.) Petitioner also was given 8 months credit for superior program achievement, and his guideline range was reduced by this amount.

Applying the 2000 Regulations, the USPC found Petitioner's Total Guideline Range to be 241–303 months when the range was calculated for his April 2005 reconsideration hearing. At the time of the hearing, Petitioner had served 152 months in custody. His next parole reconsideration hearing is scheduled for February 2010. At that time, he will have served 212 months in custody—which is roughly three years short of the time he must serve before he is presumptively suitable for parole under the USPC's calculation of the Total Guideline Range.

### (2)   *1987 Regulations*

Although the 1987 Regulations bear a passing resemblance to the 2000 Regulations, the two sets of regulations substantially differ in how they structure the discretion to grant or deny parole.

-12-

Unlike the 2000 Regulations, the 1987 Regulations do not produce a guideline range of months that must be served in custody before a prisoner will be presumptively suitable for parole; rather, the procedures prescribed by the 1987 Regulations lead to one of two outcomes: "Parole shall be granted" or "Parole shall be denied."  D.C. Mun. Regs. tit. 28, §§  204.19–.22 (1987) (repealed 2000) (hereinafter cited as 1987 Regs.).  Irrespective of whether the 1987 Regulations indicated that a prisoner's parole should be granted or denied, however, the D.C. Board retained the discretion to reach a different decision if merited by "unusual circumstances."  *Id*. § 204.22.[9]

The function of the 1987 Regulations is to produce a "total point score" (TPS) which ranges from 1 to 5.  At an initial parole hearing, a prisoner with 0, 1, or 2 points "shall be" granted parole with varying degrees of supervision.  *Id*. § 204.19.  For a prisoner with 3, 4, or 5 points, "[p]arole shall be denied at initial hearing and rehearing scheduled."  *Id*.  The TPS derived for the initial parole hearing is the starting point for subsequent reconsideration hearings.

Much like the 2000 Regulations, the first step in determining parole suitability under the 1987 Regulations is to calculate the prisoner's salient factor score (SFS).  *Id*. § 204.2.  The SFS under the 1987 Regulations rely on the same criteria as the 2000 Regulations with one minor exception: the sixth SFS factor of the 1987 Regulations accounts for a history of heroin or opiate dependence, rather than the potential advanced age of a prisoner referenced by the sixth SFS factor of the 2000 Regulations.  *Id*. § 204.4.  Appendix 2-1 to the chapter on parole violations assigns point

---

[9]  In its entirety, section 204.22 provides:

> The Board may, in unusual circumstances, waive the SFS and the pre and post incarceration factors set forth in this chapter to grant or deny parole to a candidate. In that case, the Board shall specify in writing those factors which it used to depart from the strict application of the provisions of this chapter.

values for each of the six SFS factors.[10]  The prisoner's SFS, which can range from 10 to 1, is the sum of the points assigned for each of the factors.  The SFS corresponds to one of four Risk Groups: Low (10–9 points); Fair (8–6 points); Moderate (5–4 points); or High (3–0 points).  *Id*. § 204.17. Prisoners in the Low, Fair, Moderate, or High Risk Groups receive 0, 1, 2, or 3 points, respectively, toward their TPS.

The next step under the 1987 Regulations is to assess the type of risk posed by the prisoner. The prisoner will receive 1 point toward his TPS if at least one of the following criteria apply to his criminal history: (1) the present offense was a felony of violence; (2) the present offense was a felony involving the use of a dangerous weapon; (3) the present offense was a felony violation of the D.C. Uniform Controlled Substances Act for distribution, or intent to distribute, illicit substances; or (4) the prisoner has two or more prior convictions for any of the preceding offenses. *Id*. § 204.18 & App. 2-1.

A prisoner risks receiving 1 additional point toward the TPS for "negative institutional behavior."  *Id*. § 204.18(h) & App. 2-1.  The term "negative institutional behavior" was not expressly defined in the 1987 Regulations, although the regulations referred to "serious disciplinary infractions (adjudicated under the Department of Corrections' due process procedures) while under confinement for the current offense."  *Id*. § 204.18(h).  The term was given a more concrete definition in the 1991 Guidelines:

> (1) One Class I Offense for murder, manslaughter, kidnaping, armed robbery or first degree burglary at any time during the minimum sentence (see DCMR 28-502.3, May 1987); *OR*

---

[10]  The appendices greatly simplify the process of determining if a prisoner is suitable for parole under the 1987 Regulations by functioning as a step-by-step worksheet.

(2) One Class I Offense as defined in DCMR 28-502.4 through 502.17 (May 1987) during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer; *OR*
(3) Two Class II Offenses as defined by DCMR 28-503.2 through 503.12 (May 1987) during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer.

D.C. Board of Parole, Policy Guideline 2 (Dec. 16, 1991) (citations and emphasis in original).

The 1987 Regulations permitted 1 point to be subtracted from the prisoner's TPS for "sustained achievement in the area of prison programs, industries, or work assignments." 1987 Regs. § 204.18. & App. 2-1. The 1991 Guidelines include a list of activities that qualify as program achievement: (1) completing educational or vocational programs that "enable the offender to develop an academic or job-related skill"; (2) earning a general educational development (GED) diploma; (3) earning an associate or bachelor degree; (4) completing a "sort-term special needs program[], such as drug treatment or psychological counseling, to address the offender's identified problems"; or (5) participating satisfactorily in a work detail for at least one-third of the prisoner's period of incarceration. Policy Guideline 3.

The procedures outlined above are used to calculate the TPS for a prisoner's initial parole consideration hearing. For parole reconsideration hearings, the TPS from the previous hearing is carried over and adjusted to reflect the prisoner's conduct since the last hearing. A point is added to the total if the prisoner has incurred serious disciplinary infractions since the prior hearing. *See* 1987 Regs. § 204.21 & App. 2-2. The following infractions will warrant the additional point: "(1) One Class I Offense . . .; OR (2) Two Class II Offenses." Policy Guideline 2 (citations omitted). Similarly, a prisoner can have a point deducted from the total if he has demonstrated sustained program or work achievement since the last hearing. 1987 Regs. App. 2-2; Parole Guideline 3. If the adjusted total point score falls within the range of 0 to 3, the regulations state that "[p]arole shall

-15-

be granted at this rehearing with highest level of supervision required." 1987 Regs. App. 2-2. If the total is 4 or 5, the regulations provide that "[p]arole shall be denied and a rehearing date scheduled." *Id*.

Notwithstanding the ostensibly mandatory language employed by the regulations regarding whether to grant or deny parole, the 1987 Regulations and 1991 Guidelines suggest numerous aggravating and mitigating factors that may justify a departure from the outcome dictated by the prisoner's total point score. *See* 1987 Regs. §§ 200.1, 204.22, 205.1–.4 & Apps. 2-1, 2-2; Policy Guideline 4–9. Where the parole-granting entity (i.e. D.C. Board prior to 1998 or the USPC now) exercises its discretion to disregard the total point score, it need only "specify in writing the factors which it used to depart from the strict application of the provisions of [the regulations]." 1987 Regs. § 204.22. In practice, the D.C. Board exercised its discretion with some frequency to deny parole to prisoners deemed suitable by the 1987 Regulations. *See Sellmon*, 551 F. Supp. 2d at 89–91.

### (3)    *Practical Effect of Changes in Parole Regulations*

Under the rule set forth in *Garner*, Petitioner is entitled to a "searching comparison" of the parole regulations in effect when he committed the offense and the parole regulations under which he was denied parole. *Fletcher III*, 433 F.3d at 879. The pertinent inquiry in Petitioner's case is whether the 2000 Regulations "created a significant risk of increased punishment for [Petitioner]" as compared to the 1987 Regulations and 1991 Guidelines in place when he committed the offense and for which he was sentenced. *Garner*, 529 U.S. at 257. Given that most of the factors considered under the 1987 Regulations have been incorporated into the 2000 Regulations, it is possible to take the relevant factors considered at Petitioner's 2002 and 2005 parole hearings and apply them to the 1987 Regulations. The results of this exercise should indicate whether the application of the 2000

-16-

Regulations create a significant risk that Petitioner will serve a longer sentence than he would had the 1987 Regulations been applied.

To evaluate Petitioner's suitability for parole under the 1987 Regulations, it is necessary to determine what his TPS would have been if the 1987 Regulations had been applied at his initial parole hearing in 2002. The first step is determining Petitioner's SFS. Five of the six factors comprising the SFS are common to the 1987 Regulations and the 2000 Regulations. *Compare* 1987 Regs. App. 2-1, *with* 28 C.F.R. § 2.20 Items A–F. Based on the USPC's evaluation of the SFS factors at Petitioner's 2002 hearing, (Docket 12, Ex. 3), Petitioner would receive 5 points towards his SFS under the 1987 Regulations: 2 points for one prior conviction; 1 point for one prior commitment of more than thirty days; 2 points for his age at the time of the present convictions; 0 points for having been incarcerated within the past three years; and 0 points for being on probation at the time of the present offense.[11] With a SFS of 5, Petitioner would be categorized as a "moderate" recidivism risk under the 1987 Regulations. Accordingly, he would receive 2 points towards his TPS.

The second step is evaluating the type of risk posed by Petitioner. Under this step, Petitioner would receive 1 additional point towards his TPS because the offense for which he was convicted resulted in the death of an individual and because it involved the use of a dangerous weapon.

---

[11] The sixth factor comprising the SFS under the 1987 Regulations—history of heroin or opiate dependence—is not considered under the 2000 Regulations. There is no evidence in the record as to whether Petitioner has a history of drug dependence. For present purposes, however, the Court assumes that Petitioner would not receive the additional point with the understanding that the presence or absence of this point will not be of consequence to the outcome of the analysis at the parole reconsideration hearing stage. *See infra* note 12.

The third step requires an examination of whether Petitioner's disciplinary record while incarcerated warrants the addition of a point to his TPS for negative institutional behavior. According to the 1991 Guidelines, a single Class I Offense or two Class II Offenses committed within three years of the hearing would constitute negative institutional behavior. For Petitioner, any Class I or II Offenses occurring between May 1999 and May 2002 could have been considered for this purpose at the his initial parole hearing under the 1987 Regulations. Petitioner's record reflects several infractions during the relevant time period. The infractions include adjudications for sexual misconduct on January 19, 2000, and possession of contraband on February 10, 2000. (Docket 12, Ex. 3, 4.) Each of these infractions qualify as Class II Offenses. Accordingly, Petitioner would receive 1 point for negative institutional behavior.

The final step for determining the TPS is to ascertain if Petitioner would qualify for the 1 point deduction for significant program achievement. At the initial parole hearing, a prisoner's accomplishments during their present term of incarceration are considered. Petitioner's record reflects that, prior to 2002, he completed several programs and courses, including a 132-hour life skills program, a 132-hour anger management program, and a twelve-hour pre-employment program. (Docket 12, Ex. 3.) Petitioner would receive a 1 point deduction from his TPS for these accomplishments.

Calculating the results of foregoing steps, Petitioner would have had a TPS of 3 at his initial parole consideration hearing in 2002. With a TPS of 3, the 1987 Regulations indicate that "[p]arole shall be denied at initial hearing and rehearing scheduled." 1987 Regs. § 204.19(d) & App. 2-1.

Assuming that Petitioner would have had a TPS of 3 at his initial parole consideration hearing, the Court proceeds to examine the effect the 1987 Regulations would have had on his April

2005 parole reconsideration hearing.  Petitioner's TPS of 3 would be adjusted for any negative institutional behavior or program achievement since the initial parole hearing.  *See* 1987 Regs. § 204.21 & App. 2-2.  The TPS would be increased by 1 point if Petitioner had committed one new Class I Offense or two new Class II Offenses.  The record indicates that Petitioner's TPS likely would be increased because of the following disciplinary infraction adjudications: conduct which disrupts others on November 16, 2002; fighting with another inmate on March 24, 2003; and failure to follow rules on June 28, 2004.  (Docket 12, Ex. 4, 5.)  However, the record also reflects that Petitioner had demonstrated additional program achievement since the initial hearing.  For example, he completed four anger management groups, 246 hours of the GED program, a thirty-day substance abuse program, twelve steps of a life skills program, and a ten-hour stress management program. (*Id*. Ex. 5.)  These accomplishments likely would qualify as program achievement for which 1 point would be deducted from Petitioner's TPS.  Accordingly, it is probable that Petitioner's TPS at the May 2005 parole reconsideration hearing would have been 3.  For TPSs of 3 or fewer, the regulations provide that "[p]arole shall be granted at this rehearing with highest level of supervision required." 1987 Regs. § 204.21 & App. 2-2.[12]

An assessment of Petitioner's parole suitability status under the 1987 Regulations reveals a stark contrast to his present status under the 2000 Regulations.  At his 2005 parole reconsideration

---

[12]  As noted earlier, there is no evidence in the record of drug use by Petitioner.  If he had no such history, he would have received an additional point towards his SFS under the 1987 Regulations at the initial parole hearing.  The additional point would have had the effect of lowering his recidivism risk category to "Fair" and decreasing his TPS to 2.  *See* 1987 Regs. App. 2-1.  With a TPS of 2, the regulations indicate that "[p]arole shall be granted at initial hearing with highest level of supervision required."  *Id*.  At his reconsideration hearing, his adjusted TPS would remain 2.  Whether his TPS was 2 or 3 at the reconsideration hearing is inconsequential because a prisoner with either score is presumptively suitable for parole.

-19-

hearing, the USPC determined that Petitioner would not be suitable for parole until at least 2013. If the USPC had applied the 1987 Regulations in effect when Petitioner committed his crime and received his sentence, he likely would have been deemed presumptively suitable for parole at the 2005 parole reconsideration hearing—perhaps sooner if Petitioner has no history of drug or opiate dependance. For these reasons, the Court **FINDS** that the use of the 2000 Regulations creates a significant risk that Petitioner will be subject to a longer period of incarceration.   Therefore, Petitioner's objection to the PF&R's rejection of his ex post facto argument on the merits is **SUSTAINED**.

       *B.*    *Objections to Characterization of Petitioners's Claims*

Petitioner raises objections to two portions of the PF&R that he contends misconstrue his complaint.   In the first offending section, Petitioner objects to the magistrate judge's "apparent conclusion of law" that the Court does not have authority to review the USPC's decision to deny Petitioner parole under an abuse of discretion standard.  (Docket 25 at 1–2.)  Petitioner maintains that this conclusion is inappropriate because the "case does not present any claims challenging the [USPC's] discretionary powers."  (*Id.* at 2.)  Prompting the second objection is the magistrate judge's statement that Petitioner does not have a due process right or liberty interest in release from custody prior to the expiration of his sentence.  (Docket 23 at 7 (citing *Greenholtz v. Inmates of the Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979)).)  Petitioner asserts that he makes no such claims.  (Docket 25 at 3.)

Courts are required to give pro se prisoner pleadings a liberal and deferential construction. *See Haines v. Kerner*, 404 U.S. 519, 520–21 (1972).  This is an art, not a science.  The complaint in this case was submitted on a stock form presumably supplied by the prison for filing habeas

petitions, as it is a form commonly received by the Court.  The form provides space to set forth up to four grounds for relief, with only three lines provided for petitioners to write the factual description of each ground.  The form discourages petitioners from including legal arguments.  The brevity of such complaints, coupled with the liberal construction standard, invites courts to err on the side of caution when divining petitioners' legal arguments.  Oftentimes, courts address arguments that were unintended (or, more commonly, unnoticed) by the pro se petitioner.  Generally, this is problematic only when the court overlooks the petitioner's intended argument.  It is not troublesome, however, when the court addresses arguments *in addition to* the intended argument for the purpose of noting that, to the extent that the complaint can be construed as advancing the additional arguments, they are without merit.  *Haines* requires no less.

In this case, it was reasonable for the magistrate judge to construe Petitioner's application as seeking review of the USPC's exercise of discretion and as asserting a liberty interest in early release.  Although Petitioner apparently did not intend to raise these arguments, the magistrate judge's discussion of them did not adversely affect Petitioner.  In fact, these arguments had no bearing on the recommended disposition of the petition, as they merely were addressed in addition to Petitioner's primary arguments.  Furthermore, the magistrate judge's observation that Petitioner cannot assert a meritorious claim under either of these theories is correct.  For this reason, Petitioner's objections to the purported misconstruction of his claims in the PF&R are **OVERRULED**.

### C.    *Objection to Disposition Without an Evidentiary Hearing*

Petitioner objects to the disposition of his § 2241 petition without an evidentiary hearing. Although styled as civil actions, habeas proceedings are unique in that they have both civil and

criminal aspects.  *See O'Brien v. Moore*, 395 F.3d 499, 505 (4th Cir. 2005).  As a "hybrid" form of action, the Federal Rules of Civil Procedure do not apply in their entirety to habeas proceedings. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  The Supreme Court has provided the following guidance for courts considering petitioners' requests for factual development of the record:

> [W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry. . . . [I]n exercising this power, the court may utilize familiar procedures, as appropriate, whether these are found in the civil or criminal rules or elsewhere in the "usages and principles of law."

*Harris v. Nelson*, 394 U.S. 286, 300 (1969).  Furthermore, when a court seeks to dismiss a pro se petition without discovery or an evidentiary hearing, the court is "obliged to accept a petitioner's well-pleaded allegations as true, and . . . to draw all reasonable inferences therefrom in the petitioner's favor." *Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006) (citing Rule 12(b)(6) of the Federal Rules of Civil Procedure).

The Court finds that an evidentiary hearing is unnecessary in this case at this time.  Properly construed, each of Petitioner's objections to the PF&R implicate questions of law, rather than fact. Two of his objections, the fifth and sixth, are of a factual nature.  However, these objections are moot because the Court has sustained Petitioner's ex post facto objection.  Moreover, for the purposes of addressing Petitioner's objections, the Court has accepted his allegations as true.  Thus, this objection is **OVERRULED**.

### III.  DISPOSITION OF PETITIONER'S HABEAS CLAIMS

It appears that Petitioner may have a meritorious claim that the USPC violated the Ex Post Facto Clause when it retroactively applied the 2000 Regulations to his parole hearings.  It does not follow, however, that Petitioner is entitled to the relief he requests—namely, immediate release from custody.  (Docket 15 at 20.)  Although the USPC's actions may have created a significant *risk* of an increased period of incarceration, it is by no means certain that Petitioner's time in prison has actually been increased.  When applied to Petitioner's circumstances, the 1987 Regulations indicate that parole "*shall be* granted," but this seemingly mandatory language is misleading.  The D.C. Board was given ample discretion to depart from the parole decision suggested by a strict application of the regulations.  *See* 1987 Regs. § 204.22; *see also Ellis v. District of Columbia*, 84 F.3d 1413, 1418–20 (D.C. Cir. 1996) (holding that the 1987 Regulations do not create a liberty interest for prisoners who are found to be presumptively suitable for parole).  The USPC would have no less discretion when applying the 1987 Regulations; it could faithfully apply the 1987 Regulations to Petitioner's parole request and exercise its discretion to deny parole.  Thus, notwithstanding the probable constitutional violation, Petitioner would not be entitled to an order granting him release on parole.  At best, he would be entitled to a new parole hearing with instructions to the USPC to exercise its discretion within the framework created by the 1987 Regulations and the 1991 Guidelines.  *Cf. Wilkinson v. Dotson*, 544 U.S. 74, 82  (2005) (holding that "success" for a prisoner challenging constitutionality of Ohio parole guidelines was "at most a new parole hearing at which Ohio parole authorities may, in their discretion, decline to shorten his prison term").  The Court is not in a position to grant even this measure of relief, however.

-23-

Petitioner has committed two procedural errors.  Petitioner's first mistake was bringing this action as a petition for habeas corpus under 28 U.S.C. § 2241.  Habeas relief necessarily involves a "quantum change in the level of custody, such as release from incarceration to parole." *Wilkinson*, 544 U.S. at 85 (Scalia, J., concurring) (internal quotations and citations omitted).   Indeed, Petitioner's request for release from custody is consistent with a habeas petition, but the nature of his claims do not support this form of relief.  The thrust of Petitioner's claims is that the USPC violated the Ex Post Facto Clause by applying retroactively the 2000 Regulations to his parole suitability determination.  His arguments primarily attack the procedures employed by the USPC, however, rather than its decision.  As the Supreme Court made clear in *Wilkinson v. Dotson*, the appropriate vehicle for prisoners to challenge the procedures of parole-granting entities is to bring a suit pursuant to 42 U.S.C. § 1983.  544 U.S. at 82; *see also Brown v. Johnson*, 169 Fed. App'x 155 (4th Cir. 2006) (unpublished) (holding that prisoner challenges to parole guidelines should proceed under § 1983); *Overman v. Beck*, 186 Fed. App'x 337, 228 (4th Cir. 2006) (unpublished) (noting that § 1983 is the appropriate cause of action for prisoners to "challenge the policies and procedures applicable to their parole reviews, [but] not the denial of parole itself").

Petitioner's failure to bring this suit under § 1983 is of little consequence, as courts often ignore the labels pro se plaintiffs attach to their filings.  *See Castro v. United States*, 540 U.S. 375, 381 (2003).  It is the responsibility of the Court to identify legally cognizable claims in pro se complaints and petitions and to proceed accordingly, especially when civil rights are implicated. *See Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978).  This duty often involves converting habeas petitions to § 1983 actions and vice versa.  Recharacterizing Petitioner's claim as presenting

-24-

both habeas and § 1983 claims would be an appropriate course of action here, were it not for Petitioner's second procedural mistake.

Petitioner has failed to name the members of the USPC, who are the appropriate defendants for his claims, as parties to this action. The USPC is in the unique position of being both an independent agency of the Department of Justice and a state actor when functioning as the successor to the D.C. Board. As the D.C. Circuit has observed,

> Section 1983 provides for recovery against any person who deprived the plaintiff of a constitutional right "under color of any statute . . . of any State or Territory or the District Columbia," including "any Act of Congress applicable exclusively to the District of Columbia." 42 U.S.C. § 1983. Because the D.C. Revitalization Act is such a statute, we have no doubt the defendant members of the United States Parole Commission are amenable to suit under § 1983 for actions taken pursuant to that Act.

*Fletcher v. District of Columbia* (*Fletcher I*), 370 F.3d 1223, 1227 (D.C. Cir. 2004), *vacated on other grounds*, 391 F.3d 250 (D.C. Cir. 2004).

It was necessary for the Court to compare the 1987 Regulations and the 2000 Regulations to determine whether Petitioner's claims should be denied on their merits as recommended by the PF&R. *Cf. Neal v. Fahey*, 3:07-CV-374, 2008 U.S. Dist. LEXIS 21941 (E.D. Va. Mar. 18, 2008) (dismissing habeas petition on the merits despite recognizing that complaint should have been brought under § 1983). The Court's findings under this circumstance dictate that it is inappropriate to dismiss Petitioner's complaint as being without merit. However, these findings are not binding on the USPC or its members, who have not had an opportunity to respond to Petitioner's allegations. *See Taylor v. Sturgell*, 128 S. Ct. 2161, 2166 (2008). They are, of course, binding on Respondent in this case, who is entitled to have Petitioner's habeas claims against him dismissed.

Petitioner is not without legal recourse, however.  The deference afforded to pro se complaints extends to situations such as this, where the pro se plaintiff has named the wrong defendants.  On this point, the Fourth Circuit has provided the following guidance:

> A district court is not required to act as an advocate for a *pro se* litigant; but when such a litigant has alleged a cause of action which may be meritorious against a [non-party to the action], the district court should afford him a reasonable opportunity to determine the correct person or persons against whom the claim is asserted, advise him how to proceed and direct or permit amendment of the pleadings to bring that person or persons before the court.

*Gordon*, 574 F.2d at 1152–53.  Accordingly, the Court hereby gives notice to Petitioner that he may have a meritorious cause of action under § 1983 against the individual members of the USPC in their official capacities.[13]  Petitioner shall have thirty days leave from the entry of this Order to amend his complaint if he so chooses.

### IV.  CONCLUSION

Based on the foregoing, the Court **ADOPTS** the recommendations contained in the PF&R [Docket 23] except as noted herein.  Petitioner's Application Under 28 U.S.C. § 2241 for Writ of Habeas Corpus by a Person in Federal Custody [Docket 1] is **DENIED** for failure to state a claim against Respondent.  The Clerk is **DIRECTED** to remove this case from the active docket.  A Judgment Order will be entered no less than thirty days from the entry of this Memorandum Opinion and Order unless Petitioner elects to amend the complaint.

**IT IS SO ORDERED**.

---

[13]   Although a § 1983 claim may be brought against members of the USPC in their official capacities, the USPC is the real party in interest.  *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

-26-

The Court further **DIRECTS** the Clerk to send a copy of this Order to counsel of record and

Petitioner, pro se.

ENTER:          March 24, 2009

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE